## DECLARATION OF WILLIAM L. HARRIS

I, Willaim L. Harris, hereby state and declare as follows:

1.      I am employed by the Federal Bureau of Investigation (FBI) as Unit Chief of the Discovery Unit II (DU-II), Discovery, Oversight, and Coordination Section, Litigation Branch, Office of the General Counsel (OGC), located in Washington, D.C.  I have served as Unit Chief of the DU-II from approximately March 2023 to present.  I have been employed by the FBI since September 1991.

2.      In my capacity as Unit Chief of DU-II, I am responsible for overseeing the work of the Paralegal Specialists (PLSs) assigned to my unit.

3.      The statements contained in this declaration are based upon my personal knowledge, my review and consideration of documents and information available to me in my official capacity, and on information obtained from other FBI employees.

4.      This declaration is submitted in support of the Federal Bureau of Investigation's Motion to Quash.

5.      This declaration provides an explanation of the FBI's discovery process as it relates to this specific matter, including resource constraints for ongoing litigation matters. As explained in the paragraphs that follow, Defendant Bank of America's (BANA) Subpoena to Testify or Product Documents is unduly burdensome and implicates records that may be publicly available.

### The FBI's Discovery Process

6.      BANA is generally requesting the FBI provide the following information:

- Testimony and documents sufficient to show when each investigation (referring to the FBI's Miami investigation and New York investigation into Jeffrey Epstein) began;

- Testimony and documents relating to Epstein's finances that were considered in each investigation;
- Testimony and documents relating to SARs concerning Epstein that were considered in each investigation;
- Testimony and documents sufficient to show inquiries/contact-or the lack of inquiries/contact—to BANA as part of each investigation; and
- Testimony and documents sufficient to describe the process by which law enforcement obtains and considers SARs in connection with investigations generally.

7.     To reasonably respond to BANA's subpoena, DU-II will need to run searches within the FBI's case management system, Sentinel, to pull relevant information within the FBI's classified (FBINET) enclave.

8.     To find responsive material, DU-II will need to conduct a search in the FBI's New York investigative file (50D-NY-3027571) and the Miami investigative file (31E-MM-108062).

9.     The New York Investigative file contains 734 serials.[1]   The Miami investigative file contains 265 serials and consists of documents that were migrated to Sentinel from a previous case management system in or around 2018, which may result in a more time intensive search for responsive documents.

10.     In all civil litigation matters that implicate the FBI, or implicate FBI obtained information, discovery productions are reviewed for relevance and privilege by attorneys and paralegals assigned to the FBI's OGC, Litigation Branch.   Specifically, these productions are reviewed and privileged information is redacted by trained professionals within the FBI's Discovery Units.

---

[1] Each Serial is an entry into Sentinel and may contain any number of attachments or documents.

11.     The process of searching, collecting, reviewing any documents for relevance and privilege, and making necessary redactions is labor-intensive and time-consuming. DU-II's PLSs gather any physical copies of responsive information and conduct searches within Sentinel for documents.  The Sentinel results are downloaded to a shared drive, and an eDiscovery Technical Advisor (ETA) ingests the documents into the FBI's eDiscovery Platform ("eDP") and runs any requested keyword searches within those results. FBI attorneys review the search results and, in consultation with Assistant United States Attorneys (AUSAs), conduct a relevancy review to determine which, if any, electronic documents are responsive to discovery or subpoena requests. This material is tagged by the reviewing attorney in eDP as either relevant or non-relevant.

12.     Once the government attorneys have completed their relevancy reviews, the ETAs move the data tagged relevant to the privilege review folder for the DU PLSs to conduct privilege reviews.

13.     Part of this process includes DU sending any classified material to undergo classification review with the FBI Information Management Division's National Security Classification Operations Unit (NSCOU) which is not part of OGC.  The NSCOU is responsible for reviewing documents for national security purposes.  This includes a line-by-line review of documents responsive to civil or criminal discovery proceedings and special administrative reviews requested by other FBI components.  It is my understanding that part of the NSCOU's review of documents could involve consultation with individuals from other FBI components having both the appropriate subject matter expertise and Original Classification Authority. The information often needs to be reviewed in the aggregate since information in one document coupled with information from another document could be considered classified when the

information is taken together.  Requests for classification review require a minimum of three weeks to complete.

14.     Following a review by NSCOU, the documents are returned to the Litigation Branch for privilege review.  Since NSCOU uses a different review platform which is not compatible with the Litigation Branch's review platform, each document must be reformatted one at a time and re-ingested into eDP prior to the privilege review.

15.     The privilege review consists of a line-by-line review for any information that is either protected by a privilege or otherwise protected from disclosure by federal law, including the Bank Secrecy Act, within the relevant material before the FBI can release the relevant material outside of the FBI. A line-by-line review is a burdensome manual task requiring the assigned DU PLS to review every word on every page of a document, looking for any privileged information, which also includes recognizing that information on one page that normally does not qualify as privileged information on its own could be privileged when combined with information from another page of the document. The DU redaction process consists of a first- and second-line review by PLSs and a third review by a Supervisory PLS (SPLS).  The three reviews are standard procedure, and each review is conducted by a different experienced PLS.  During this process, the PLSs often consult with the attorneys assigned to the case. After DU's review is complete, an attorney assigned to the case reviews the documents to confirm the proper application of privilege redactions.

16.     After the attorneys complete their review of the documents, the documents are prepared for review by the AUSAs assigned to the case. This requires the documents to be exported from eDP with transparent redactions applied.  If the documents are unclassified, they are downdrafted from FBINET to UNET and then transmitted to the AUSA for their review.  If the

documents contain classified information, they are shared with DOJ via classified email or other appropriate methods.  The AUSA may then coordinate with the FBI attorneys assigned to the case to discuss redactions. After the AUSA completes its review, DU makes any changes necessary to the redactions. FBI and AUSA then conduct a final review of the documents. Afterwards, the documents are produced to the requesting counsel. This is the standard process for review.

17.     As these documents will be collected from Sentinel, all of the relevant documents are stored on the classified system. Any materials originating on the classified system, even those originally marked as being unclassified, have the possibility of containing classified information. These materials cannot be removed from this classified system before undergoing redactions during the privilege review.

## FBI's Resource Limitations

18.     This entire process, from collection to production, is time intensive and can take several months depending on how many documents are deemed responsive.

19.     Moreover, the DUs are currently experiencing a period of reduced staffing due to the loss of several employees. Although the "Funded Staffing Level" for the DUs is thirty-three (33) positions, the DUs are currently operating with only twenty-eight (28) positions filled.

20.     As of March 2, 2026, the DUs have 276 open and active discovery matters, many of which are also subject to District Court imposed deadlines or include classified information concerning national security. In addition to litigation work, the DU paralegals are also responsible for conducting privilege reviews of EEO administrative matters, Office of Professional Responsibility matters, Office of Disciplinary Appeals matters, security clearance revocations and denials, and other performance related matters

21.     Due to the burdensome nature of FBI's discovery process and the DU's current limited resources, the FBI will not be able to complete production of the requested documents before the end of the Parties' discovery deadline of March 16, 2026.

22.     Furthermore, I understand that the Department of Justice publicly released approximately 3.5 million pages of documents pursuant to the Epstein Files Transparency Act ("EFTA"), H.R. 4405, which mandated, with limited exceptions, release of "unclassified records, documents communications, and investigative materials in the possession of the Department of Justice, including the Federal Bureau of Investigation and United States Attorneys' Offices" that related to the following categories:

(1) Jeffrey Epstein including all investigations, prosecutions, or custodial matters.
(2) Ghislaine Maxwell.
(3) Flight logs or travel records, including but not limited to manifests, itineraries, pilot records, and customs or immigration documentation, for any aircraft, vessel, or vehicle owned, operated, or used by Jeffrey Epstein or any related entity.
(4) Individuals, including government officials, named or referenced in connection with Epstein's criminal activities, civil settlements, immunity or plea agreements, or investigatory proceedings.
*(5) Entities (corporate, nonprofit, academic, or governmental) with known or alleged ties to Epstein's trafficking or financial networks.*
(6) Any immunity deals, non-prosecution agreements, plea bargains, or sealed settlements involving Epstein or his associates.
(7) Internal DOJ communications, including emails, memos, meeting notes, concerning decisions to charge, not charge, investigate, or decline to investigate Epstein or his associates.
(8) All communications, memoranda, directives, logs, or metadata concerning the destruction, deletion, alteration, misplacement, or concealment of documents, recordings, or electronic data related to Epstein, his associates, his detention and death, or any investigative files.
(9) Documentation of Epstein's detention or death, including incident reports, witness interviews, medical examiner files, autopsy reports, and written records detailing the circumstances and cause of death.

(emphasis added).

23.     Given the expansive nature of the EFTA, it is my understanding that some, if not all, of the Defendant's requested records are publicly available and can therefore be accessed by the Parties to this litigation through less burdensome means.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

March 4, 2026

*William L. Harris*

William L. Harris
Chief, Discovery Unit II
Litigation Branch
Office of the General Counsel
Federal Bureau of Investigation
Washington, D.C.